## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE GARCIA, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>BANKRATE, INC., PETER C. MORSE, KENNETH S. ESTEROW, SETH BRODY, MICHAEL J. KELLY, SREE KOTAY, CHRISTINE PETERSEN, RICHARD PINOLA, and MITCH TRUWIT, )<br><br>Defendants. ) | Case No. 1:17-5844<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jose Garcia ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Bankrate, Inc. ("Bankrate" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Bankrate, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Bankrate, Red Ventures Holdco ("Parent"), and Baton Merger Corp. ("Merger Sub," and together with Parent, "Red Ventures").

2.     On July 2, 2017, the Board caused the Company to enter into an agreement and

plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $14.00 in cash for each share of Bankrate common stock they own (the "Merger Consideration").

3.      On July 28, 2017, the Board authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analyses performed by the Company's financial advisor, J.P. Morgan Securities LLC, ("J.P. Morgan"), in support of its fairness opinion.

6.      The special meeting of Bankrate shareholders to vote on the Proposed Merger is forthcoming. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Bankrate

shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant, either, because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Bankrate maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a Bankrate stockholder.

12.      Defendant Bankrate is a Delaware corporation and maintains its headquarters at 1675 Broadway, 22nd Floor, New York, New York 10019. Bankrate is a leading online publisher, aggregator, and distributor of personal finance content. The Company's vision is to help consumers

Maximize Your Money™ when they borrow, save, or invest. Bankrate's common stock trades on the NYSE under the ticker symbol "RATE".

13.     Individual Defendant Peter C. Morse is a director of Bankrate and is the Chairman of the Board.

14.     Individual Defendant Kenneth S. Esterow is a director of Bankrate and is the President and Chief Executive Officer of the Company.

15.     Individual Defendant Seth Brody is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Michael J. Kelly is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Sree Kotay is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Christine Petersen is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant Richard Pinola is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant Mitch Truwit is, and has been at all relevant times, a director of the Company.

21.     The parties identified in paragraph 12 through 20 are collectively referred to as Defendants.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Bankrate (the "Class"). Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of July 24, 2017, there were approximately 89,695,515 shares of Bankrate common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Bankrate will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.      The Merger Consideration Appears Inadequate in Light of Bankrate's Future Outlook**

24.      Bankrate, incorporated on April 13, 2011, is a publisher, aggregator, and distributor of personal finance content on the Internet. The Company provides consumers personal finance editorial content across multiple vertical categories, including mortgages, deposits, credit cards, senior care, and other personal finance categories. The Company's segments include Banking, Credit Cards, and Senior Care, among others. The Company provides a range of digital display advertising formats. The Company is also engaged in the sale of print advertisements and the distribution, or syndication, of its editorial content.

25.      The Merger Consideration is severely inadequate given Bankrate's recent financial performance and strong growth prospects.  In the year leading up to the announcement of the Proposed Merger Bankrate's stock price increased over 70%, going from $7.50 on July 5, 2016 to

$12.85 on June 30, 2017, illustrated by the chart below:



26.    Indeed, on May 4, 2017, the Company announced positive financial results for the 2017 first quarter. The Company exceeded both earnings and revenue projections. First quarter revenue was up 27% year-over-year and first quarter adjusted EBITDA was up 30% year-over-year. President and CEO Paul A. Dillahay announced:

> "We are pleased to report another quarter of solid financial and business performance which confirms that our strategy is working. Investors may recall that at the beginning of 2016 we made three commitments: to accelerate the growth of our leading Credit Cards marketplace, to return our Banking segment to both top and bottom line growth and to ramp Caring.com's network of senior living communities.  We once again delivered against these commitments in the first quarter. Our Credit Cards segment grew revenue 35% in the quarter. We continued to grow Credit Cards segment consumer inquiry volume and revenue, even excluding the benefit of NextAdvisor.   In Banking, we continued the shift towards a

performance marketing platform and for a second consecutive quarter our progress was notable.  Banking segment revenue and Adjusted EBITDA grew 18% and 70%, respectively.  Banking produced a seventh consecutive quarter of year over year mortgage revenue growth despite a decrease in overall mortgage originations in the U.S., and for the first time in over two years grew revenue from deposit products year over year. Finally, Caring.com's network of senior living communities now exceeds 7,500, its most ever."

27.    However, since the announcement of the Proposed Merger, multiple financial analysts have downgraded their position on Bankrate, indicating their dissatisfaction with the Merger Consideration.

28.    Finally, J.P. Morgan valued the company at a higher price than the Merger Consideration. J.P. Morgan calculated an implied equity value per share of up to $18.50.

29.    In sum, the Merger Consideration appears to inadequately compensate Bankrate shareholders for their shares.  Given the Company's strong financial results and growth potential, it appears that $14.00 per share is not fair compensation for Bankrate shareholders. It is therefore imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Merger.

## II.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers

30.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Bankrate.

31.    First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Bankrate shareholders. The Merger Agreement states that the Company and the Individual

Defendants shall not:

> (i) initiate, solicit or knowingly facilitate or knowingly encourage any inquiries, discussions or requests with respect to or the making of any proposal or offer that constitutes or would reasonably be expected to lead to an Acquisition Proposal (an "Inquiry"), (ii) enter into, continue or otherwise engage or participate in any discussions or negotiations regarding an Acquisition Proposal or Inquiry or that would reasonably be expected to lead to an Acquisition Proposal, or provide access to its properties, books or records or any non-public information to any Person relating to the Company or any of its Subsidiaries in connection with the foregoing, (iii) enter into any other acquisition agreement, option agreement, joint venture agreement, partnership agreement, letter of intent, term sheet, merger agreement or similar agreement (other than an Acceptable Confidentiality Agreement) with respect to an Acquisition Proposal (an "Alternative Acquisition Agreement"), (iv) approve, endorse, declare advisable or recommend any Acquisition Proposal, (v) take any action to make the provisions of any Takeover Statute or any restrictive provision of any applicable anti-takeover provision in the certificate of incorporation or bylaws of the Company inapplicable to any transactions contemplated by any Acquisition Proposal or (vi) authorize, commit to, agree or publicly propose to do any of the foregoing.

32.    Additionally, the Merger Agreement grants Red Ventures recurring and unlimited matching rights, which provides Red Ventures with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) three business days to negotiate with Bankrate, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

33.    The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Red Ventures can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Red Ventures, to the detriment of Bankrate's public shareholders.

34.    Lastly, the Merger Agreement provides that Bankrate must pay Red Ventures a

termination fee of $37,675,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Bankrate shareholders with a superior offer.

35.    Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

36.    Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Bankrate's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

## III.    The Proxy Is Materially Incomplete and Misleading.

37.    On July 28, 2017 Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger.

38.    First, the Proxy fails to disclose Bankrate's unlevered free cash flow projections[1] for the *Base Case,* the *High Sensitivity Case*, and the *Low Sensitivity Case* projections.  See Proxy

---

[1]    Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

41-42. These unlevered free cash flows are material to the Company's shareholders. Indeed, J.P. Morgan specifically utilized unlevered free cashflows in their discounted cash flow valuation. Investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest. Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the Bankrate's expected unlevered free cash flows? Without unlevered free cash flow projections, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

39.    Adjusted EBITDA is not a sufficient alternative to unlevered free cash flows – as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy."[2] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[3] As a result of these material differences between EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company. Simply put, the unlevered free cash flow

---

[2]    Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[3]    Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

projections are material and their omission renders the projections included in the Proxy misleading.

40.     Moreover, the Proxy completely omits any of the income-based projections Bankrate's management prepared for both the *High Sensitivity Case* and the *Low Sensitivity Case*. The inclusion of income-based projections for the *Base Case* requires their disclosure for all Cases, so that shareholders can judge for themselves the reasonableness of managements determinations. Therefore, the omission of these projections renders then Proxy materially incomplete and misleading.

41.     The omission of all the above-referenced projections renders the financial projections included on pages 41-42 of the Proxy materially incomplete and misleading. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

42.     Further, the Proxy fails to provide material information concerning the Company's included financial projections. Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including Adjusted EBITDA, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

43.     When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable

method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

44.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Bankrate has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[4]

45.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the

---

[4]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

use of such projections.[5] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[6] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

46.     In order to make the projections included on pages 41-42 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

47.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including Adjusted EBITDA (Adjusted EBITDA adds back interest and other expense; income tax (benefit) expense; depreciation and amortization; net income (loss) from discontinued operation; changes in fair value of contingent acquisition consideration; acquisition, disposition, offering and related expenses; restructuring charges; impairment charges; Next Advisor contingent deferred compensation for the acquisition; costs related to the restatement of certain historical financial statements, the internal review, governmental investigations and related litigation and indemnification obligations; purchase accounting adjustments; stock-based compensation; legal settlements; and the results of the operations in China as the Company is winding them down and

---

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

ceasing the operations.).  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.

48.    Clearly, shareholders would find this information material since the Board's unanimous recommendation that shareholders vote in favor the Proposed Merger was based, in part on the following:

> • The Bankrate board of directors considered that the merger consideration was more favorable to Bankrate stockholders than the potential value that would reasonably be expected to result from other alternatives reasonably available to Bankrate, including the continued operation of Bankrate on a standalone basis, taking into account its strategic alternatives and financing plans on an ongoing basis, in light of a number of factors, including … the Bankrate board of directors' assessment of Bankrate's business, assets and prospects, its competitive position and historical and projected financial performance…[.]  Proxy, 36.

Proxy, 36.

49.    On page 42 of the Proxy, Bankrate states that it is unable to make these reconciliations without unreasonable effort. This is a misstatement, because the Company regularly performs non-GAAP reconciliations in both their press releases and their earnings reports filed with the SEC. In fact, the Company specifically performed line item GAAP reconciliations for Adjusted EBITDA in their most recent 10K:

| | | Year ended December 31, | | | |
|---|---|---|---|---|---|
| (In thousands) | 2016 | 2015 | 2014 | 2013 | 2012 |
| (Loss) income before taxes | $ (25,694) | $ 26,957 | $ 15,279 | $ 126 | $ 31,310 |
| Interest, net and other expenses | 19,677 | 22,279 | 20,816 | 24,961 | 25,525 |
| Depreciation and amortization | 42,247 | 40,843 | 34,502 | 31,854 | 28,322 |
| Stock-based compensation [a] | 19,159 | 19,417 | 13,870 | 9,834 | 7,638 |
| Loss on extinguishment of debt | - | - | - | 17,175 | - |
| Change in fair value of contingent acquisition consideration | (6,481) | (421) | 3,633 | 17,380 | (2,347) |
| Acquisition, disposition, offering and related expenses | 1,811 | 569 | 3,590 | 81 | 601 |
| Restatement-related charges | 7,853 | 11,432 | 23,586 | 1,269 | 1,249 |
| Legal settlements | 5,345 | 3 | 1,403 | - | 874 |
| China operations [b] | 1,682 | 393 | 565 | 882 | 853 |
| Restructuring-related expenses | (117) | 5,616 | - | - | 267 |
| Impairment charges | 43,110 | - | - | - | - |
| Impact of purchase accounting | - | 35 | 556 | - | - |
| Other charges [c] | 6,205 | - | - | 6,802 | - |
| Adjusted EBITDA | $ 114,797 | $ 127,123 | $ 117,800 | $ 110,364 | $ 94,292 |

(a)Excludes $3.9 million, $3.2 million, $2.3 million, $1.5 million and $796,000 in 2015, 2014, 2013, 2012 and 2011, respectively, related to the disposition of our Insurance business, which is included in net (loss) income from discontinued operation. Excludes $5.8 million related to CEO transition in 2013, which is included in other charges.

(b)Represents the loss from the operations in China, and includes legal and other costs incurred to wind down those operations. The results of China were previously presented as a discontinued operation when it was actively marketed for sale. After the negotiations with the potential buyer did not result in a sale of the business, we initiated the process to wind down the operations.

(c)Other charges include (i) $6.2 million for contingent deferred compensation expense related to the NextAdvisor acquisition for 2016 and (ii) CEO transition costs of $6.8 million (of which $5.8 million is stock-based compensation) for 2013.

50.     With respect to J.P. Morgan's Discounted Cash Flow Analysis, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 10.5% to 12.5%; (ii) the inputs and assumptions underlying the calculation of the Base Case perpetuity growth rate range of 2.5% to 3.5%; and (iii) the actual range of terminal values calculated and utilized in the Analysis.

51.     These key inputs are material to Bankrate shareholders, and their omission renders the summary of J.P. Morgan's Discounted Cash Flow Analysis on page 48 of the Proxy incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

52.     With respect to J.P. Morgan's *Analyst Price Targets*, the Proxy fails to disclose the

individual price targets J.P. Morgan reviewed. The omission of these individual targets renders the corresponding summary materially misleading. A fair summary of price targets requires the disclosure of the individual targets from each equity research analyst; merely providing the range that a banker observed is insufficient, as shareholders are unable to assess whether the banker summarized fairly, or, instead, provided only the figures that best present the price targets in light of to the Merger Consideration.

53.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act, Rule 14a-9, and 17 C.F.R. § 244.100 Promulgated Thereunder)**

54.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

56.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

57.    SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

58.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

59.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by J.P. Morgan in support of its fairness opinion.

60.    In so doing, Defendants made untrue statements of fact and/or omitted material

facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

61.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that J.P. Morgan reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by J.P. Morgan as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

62.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review J.P. Morgan's analyses in connection with their receipt of the fairness opinion, question J.P. Morgan as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

63.    The Individual Defendants were, at the very least, negligent in preparing and

reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing

materially false or misleading statements or omitting a material fact constitutes negligence.   The

Individual Defendants were negligent in choosing to omit material information from the Proxy or

failing to notice the material omissions in the Proxy upon reviewing it, which they were required

to do carefully as the Company's directors.   Indeed, the Individual Defendants were intricately

involved in the process leading up to the signing of the Merger Agreement and the preparation of

the Company's financial projections.

64.     Bankrate is also deemed negligent as a result of the Individual Defendants'

negligence in preparing and reviewing the Proxy.

65.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the

Class, who will be deprived of their right to cast an informed vote if such misrepresentations and

omissions are not corrected prior to the vote on the Proposed Merger.

66.     Plaintiff and the Class have no adequate remedy at law.   Only through the exercise

of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate

and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

68.     The Individual Defendants acted as controlling persons of Bankrate within the

meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as

officers and/or directors of Bankrate, and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the incomplete and misleading statements contained in

the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

71.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed. Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 2, 2017

Respectfully submitted,

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*

Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com

**FARUQI & FARUQI, LLP**
James M. Wilson (JW-8569)
685 Third Ave., 26th Fl.
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
jwilson@faruqilaw.com

*Attorneys for Plaintiff*